[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 7, 2009
THOMAS K. KAHN
CLERK

No. 08-16506
Non-Argument Calendar

_____

Agency No. A079-489-579

ROLEX CESAR,

                                                          Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                          Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 7, 2009)

Before BIRCH, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Rolex Cesar, a native and citizen of Haiti, petitions our court for review of

the Board of Immigration Appeals' ("BIA") dismissal of his appeal from the Immigration Judge's ("IJ") order denying him asylum and withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Having carefully reviewed the record and the parties' briefs, we discern no reversible error, and DENY the petition.

## I. BACKGROUND

Cesar arrived in the United States in October 2000 and filed an application for asylum, withholding of removal, and CAT relief in July 2001, alleging persecution based on his political opinion and membership in a particular social group. Cesar stated in his asylum application that in April 2000, the Organization for the People in Struggle ("OPL") nominated him as its candidate for an elected political position in the area where he lived. As soon as he started campaigning, members of the Fanmi Lavalas Party, headed by then-President Jean-Bertrand Aristide,[1] began persecuting him and his family because they knew Cesar "would beat their candidate." The first persecutory incident occurred when a group of Lavalas members went to his house "to scare [him]" and, not finding him home, went to his sister's house and beat her. Immediately after learning of this incident, Cesar went to a local radio station and denounced the Lavalas Party on-air during a

_____

[1] President Aristide resigned and left Haiti in 2004.

2

broadcast. Upon returning home, Cesar discovered that a group of Lavalas members, together with uniformed police officers, had gone to his house while he was at the radio station, threatened his family, and beaten both his brother and his sister.

Cesar further alleged in his application that he did not take part in the 21 May 2000 election but was active in speaking out against instances of election fraud perpetrated by the Lavalas Party. This "infuriated" the Lavalas, prompting them to "intensif[y] their persecution" of him and his family. Cesar claimed that on 17 July 2000, Lavalas members ransacked Cesar's house when he was not home and on 2 August 2000, a "bunch of" Lavalas members cornered him and beat him as he was traveling to Cape Haitian. He stated that the Lavalas would have killed him had he not been able to free himself and escape into the woods, where he hid until his assailants left the area. Cesar fled Haiti on a freighter ship on 20 October 2000 and arrived in Florida three days later.

In support of his request for relief, Cesar submitted the asylum application of his brother, Weslin, who ultimately was granted asylum after being threatened and beaten in connection with his duties as a police officer. Weslin alleged in his application that Cesar was a member of OPL from 1999 until 2000, and was persecuted by Lavalas members during this time. Cesar also submitted various reports and articles addressing the country conditions in Haiti.

3

During his September 2004 credible fear interview, Cesar initially told the asylum officer that he was a member of OPL but never became a leader in the group, nor did he ever seek a political position or use his connections to OPL to obtain employment. When the officer asked Cesar to explain why he had stated in his application that he was an OPL candidate for a political position, he responded "I did that too," and indicated that he did not know what the officer had meant when the officer asked Cesar if he had tried to become an OPL leader. Though Cesar indicated that he had been attending OPL meetings for two years, he was unable to identify any of the OPL's local or national leaders. When asked how it was possible that he attended OPL meetings for two years given his earlier statement that he had joined OPL in April 2000 and fled Haiti just six months later, in October 2000, Cesar responded, "No, it was less than two years," and offered no explanation for the inconsistency between his two statements. Cesar further told the asylum officer that he was first persecuted because of his OPL candidacy on 17 July 2000, when Lavalas ransacked his house and beat him, but when confronted with contradictory statements he made in his asylum application that he was not home on 17 July, he stated simply that the asylum application was "wrong" and that he was in fact attacked when the Lavalas came to his house that day. Finally, Cesar clarified that during the 2 August 2000 attack he was beaten by "more than twenty" police officers. The asylum officer found that Cesar was not credible and

4

referred the matter to the IJ. After receiving a notice to appear ("NTA") charging him with removability under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without having been admitted or paroled, Cesar appeared before an IJ, admitted the allegations in the NTA, and conceded removability.

At his September 2007 removal hearing, Cesar testified that he became a member of the OPL party in January 1999, and was selected in April 2000 as OPL's candidate for political office in the 2000 election. That same month, a group of Lavalas members went to his mother's house looking for him and, not finding him there, proceeded to his sister's house, where they beat her and threatened to kill Cesar if he did not stop his campaign. That very day, Cesar appeared on the local radio station and described what the Lavalas had done to his sister. Following the broadcast, a group of Lavalas members again went to Cesar's mother's house, where Cesar was living. Although Cesar was not home, his brother, Horbet, and sister, Luxie, were at the house when the Lavalas arrived. Horbet was able to flee, but the Lavalas beat Luxie "very, very severely." Cesar went into hiding in La Bria for about a month and a half following this incident but went back on the radio to speak out against corrupt practices employed by the Lavalas during the 21 May 2000 election. Cesar further testified that on 17 July 2000, a group of Lavalas members went to his mother's home and "smashed every

5

single item they could come across." On 2 August 2000, a group of people grabbed him as he was boarding a bus and beat him.

On cross-examination, Cesar admitted that he did not have any documentary evidence corroborating his OPL membership or candidacy for public office. When asked to explain the discrepancy between his testimony that Horbet was unharmed when Lavalas members confronted Horbet and Luxie at Cesar's mother's house and his statement in his asylum application that Horbet was beaten during that encounter, Cesar indicated that one of the intruders had struck Horbet in the back with a rock as Horbet fled from the house and that was why he had stated in his asylum application that Horbet had been beaten. When asked why he made no mention in his asylum application of his second radio appearance, during which he denounced the Lavalas Party's alleged election fraud, Cesar responded that he did tell the person who prepared his asylum application about this incident. Cesar further testified that approximately ten people beat him up on 2 August 2000, and that he did not recall telling the asylum officer during his credible fear interview that more than twenty people attacked him that day.

The IJ denied Cesar's application for asylum, withholding of removal, and CAT relief. The IJ determined that Cesar was not a credible witness, citing the following discrepancies among Cesar's asylum application, credible fear interview, and testimony at the removal hearing: (1) Cesar testified that only his sister was

3

beaten when the Lavalas members visited his home, but stated in his asylum application that both his brother and sister were beaten; (2) Cesar testified that he appeared on the radio twice, but mentioned only the first appearance in his asylum application; (3) Cesar testified that he was first subjected to persecution by the Lavalas in April 2000, but told the asylum officer that his problems with the Lavalas did not begin until 17 July 2000; (4) Cesar told the asylum officer during his credible fear interview that he was harmed on July 17, but alleged in his asylum application that he was not at home on that day; and (5) Cesar testified that approximately ten people beat him up on 2 August 2000, but told the asylum officer that over twenty people beat him on that day.

The IJ found alternatively that, even assuming Cesar was credible, his claims were due to be denied because of changed conditions in Haiti. The IJ also found that the grant of asylum to Cesar's brother, Weslin, was irrelevant to this case because unlike Weslin, Cesar was not a police officer, and there was no evidence that Weslin's asylum claim was in any way connected to the events underlying Cesar's asylum claim. Lastly, the IJ denied CAT relief, finding that Cesar did not suffer torture in the past, and, because of the change of government in Haiti, could not establish that he would be singled out for torture in the future.

The BIA dismissed Cesar's appeal from the IJ's denial of relief, finding that the IJ's adverse credibility determination was supported by "specific and cogent

reasons based on the record, including differences between the asylum application and [Cesar's] testimony," and therefore, was not clearly erroneous. The BIA concluded that Cesar thus failed to meet his burden of proof with regard to any of his claims.

## II. DISCUSSION

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). To the extent that the BIA does adopt the IJ's reasoning, we review the IJ's decision as well. See id. Because in this case the BIA relied on the IJ's reasoning and made findings of its own, we review both the IJ's and BIA's decisions.

We review legal conclusions de novo and factual findings, including credibility determinations, under the substantial evidence test, which requires us to affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation marks and citation omitted). Under this highly deferential standard, we view the record in the light most favorable to the BIA's decision and are bound by that decision unless a reasonable adjudicator would be compelled to conclude to the contrary. See Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). Accordingly, "even if the evidence could support multiple conclusions, we must affirm the agency's

8

decision unless there is no reasonable basis for that decision." Id. at 1029.

In his petition for review, Cesar argues that the IJ's adverse credibility finding was erroneous because: (1) his asylum interview took place more than three years before his in-court testimony, rendering any discrepancies between the two "trivial and minor"; (2) the IJ's "strict reliance" on his asylum interview to find discrepancies was "unreasonable"; (3) the IJ wrongly discounted Cesar's explanation of the discrepancies between his testimony and the asylum interview; and (4) Cesar's testimony did not contradict the country conditions in Haiti. Cesar adds that because his mistreatment in Haiti amounted to past persecution and he established a well-founded fear of future persecution, he is eligible for asylum and withholding of removal.[2]

To establish eligibility for asylum, the applicant must, with credible evidence, demonstrate that he was (1) persecuted in the past on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) has a well-founded fear of future persecution on account of a statutorily-protected ground. See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a), (b); see also Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006) (per

---

[2] Cesar does not challenge the BIA's denial of CAT relief in his petition for review and therefore has abandoned this issue. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).

curiam).[3]

An applicant's testimony may be sufficient, without corroboration, to sustain this burden, so long as the trier of fact is satisfied that the applicant's testimony is credible. See INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii); 8 C.F.R. § 208.13(a). On the other hand, an adverse credibility determination alone is sufficient to support the denial of relief, especially where the applicant produces no evidence other than his own testimony. Forgue, 401 F.3d at 1287. Where the applicant produces other evidence of persecution, the IJ must consider that evidence and may not rely solely on an adverse credibility determination to deny relief. See id.

"Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." Forgue, 401 F.3d at 1287 (quotation marks and citation omitted). Because we review credibility determinations under the substantial evidence test, we "may not substitute [our] judgment for that of the BIA with respect to credibility findings." D-Muhumed v.

---

[3] To establish eligibility for withholding of removal under the INA, an applicant must demonstrate that it is "more likely than not" that she will be persecuted upon returning to her home country on account of a protected ground. Fahim v. United States Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam) (quotation marks and citation omitted). Because "[t]his standard is more stringent than the well-founded fear of future persecution required for asylum," Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (quotation marks and citation omitted), an applicant who fails to establish eligibility for asylum is generally precluded from qualifying for withholding of removal, see Al Najjar, 257 F.3d at 1292-93.

U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004). Like any finding of fact, a credibility determination may not be overturned unless the record compels it. Forgue, 401 F.3d at 1287.

The IJ's finding that Cesar was not credible when he claimed to have suffered past persecution in Haiti due to his political opinion was supported by substantial evidence in the record, which reflects material inconsistencies between Cesar's asylum application and his testimony at the removal hearing. First, while Cesar stated in his asylum application that Lavalas members entered his home some time in April 2000 and beat up both his sister and his brother, Horbet, he testified at the removal hearing that only his sister was beaten during this encounter and that Horbet managed to escape unharmed. Cesar attempted to explain away this discrepancy by stating that the Lavalas had thrown a rock at Horbet, striking him on his back, as he fled from the house. Because there is a manifest difference between being struck with a thrown rock and being beaten, the record does not compel a reversal of the IJ's finding that Cesar's explanation of this discrepancy was not credible.

Second, Cesar testified that he spoke out against the Lavalas on-air during another radio broadcast following the May 2000 election, yet he made no mention of this second radio appearance in his asylum application. Cesar blamed this omission on the person who prepared his asylum application. In the absence of

11

any evidence corroborating this explanation, however, we will not disturb the IJ's finding that it was incredible. See Chen, 463 F.3d at 1233.

Although these two inconsistencies alone provide ample support for the IJ's adverse credibility determination, we also note that several of the statements Cesar made under oath during his credible fear interview were directly at odds with both his asylum application and his in-court testimony. For example, Cesar told the asylum officer that the first persecutory act to which he was subjected occurred on 17 July 2000, yet both his asylum application and in-court testimony detail mistreatment prior to this date. Further, while Cesar told the asylum officer that he was beaten when Lavalas members came to his residence on July 17 – and that his statement to the contrary in his asylum application was erroneous – he never mentioned this alleged beating at the removal hearing, testifying only that Lavalas members smashed items in his mother's house. Finally, Cesar told the asylum officer that during the August 2 incident he was beaten by over twenty people, but testified at the removal hearing that he was beaten by only ten people.

In light of the numerous inconsistencies in the record and the absence of other evidence corroborating Cesar's allegations of persecution, we have little difficulty concluding that substantial evidence supported the IJ's and BIA's specific, cogent reasons for finding that Cesar did not testify credibly.

### III. CONCLUSION

Cesar petitions this court for review of the BIA's order dismissing his appeal from the IJ's denial of his application for asylum and withholding of removal. Because substantial evidence supports the IJ's and BIA's finding that Cesar was not credible, and nothing in the record would compel a reasonable fact finder to conclude otherwise, the IJ and BIA properly found that Cesar was ineligible for either asylum or withholding of removal. Accordingly, we **DENY** the petition.